UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MAUREEN REYNOLDS, ) | | |
|     Plaintiff, ) | | |
| ) | | |
|   vs. ) | | 1:07-cv-171-SEB-TAB |
| ) | | |
| UNITED STATES OF AMERICA, ) | | |
|     Defendant. ) | | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 76], filed on February 16, 2010, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff, Maureen Reynolds, brings this action against Defendant, the United States of America, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-80, alleging that a malicious prosecution was instituted against her by two individuals acting in their capacity as federal law enforcement officers. For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment.

**Factual Background**

In August 2003, Ms. Reynolds was employed as a security officer by a private security firm, General Securities Services Corporation ("GSSC"), which had contracted with the Department of Homeland Security, Federal Protective Service ("FPS"),[1] to

---

[1] FPS is a federal law enforcement agency that provides integrated security and law enforcement services to federally owned and leased buildings, facilities, properties, and other assets. Its services include maintaining a uniformed law enforcement presence on federal

provide security at the Minton Capehart Federal Building ("Federal Building") in Indianapolis, Indiana. In the course of performing her duties, Ms. Reynolds was accused by two investigative employees of FPS of having falsely reported to the FPS officers certain details of a security breach. This prompted the officers to lodge a criminal complaint against Reynolds with the Marion County Prosecutor, who then filed charges of false reporting in the Marion Superior Court. Ms. Reynolds was ultimately acquitted of those charges and subsequently brought the instant state law claim of malicious prosecution pursuant to the FTCA against the FPS officers, accusing them of having maliciously prosecuted her by acting "with malice" and "without probable cause" in filing their criminal complaint against her. Despite her acquittal, Reynolds alleges the charges caused her to incur the costs of mounting a defense and ultimately brought about the termination of her employment with the GSSC. The events underlying the security breach culminating in the charges filed against Ms. Reynolds are as follows:

     At approximately 9:15 p.m., on the evening of August 31, 2003, Officer William Dobbins, a contract security guard on duty at the Federal Building, used the freight elevator to access the Building's penthouse on the sixth floor. When Dobbins reached the sixth floor, he stopped the elevator car and undressed, leaving his loaded firearm, uniform, and keys to the Federal Building unsecured in the elevator. Dobbins then opened a door to the roof of the Building and stepped out onto the roof, allowing the door

---

property, including armed contract security guards, and conducting building security assessments as well as criminal investigations.

to shut behind him.  When he realized that he did not have his keys to open the door because he had left them behind, along with his firearm and uniform in the unsecured elevator, Dobbins attempted to shout for another officer to open the door.  When he received no response, he attempted to pry the penthouse door open, but his efforts proved unsuccessful.

    Not until approximately 11:00 p.m., when Dobbins made another attempt to shout for help,  was he finally heard.  At that time, Sergeant Frank Gay, the second shift supervisory security guard, accessed the roof using a stairwell and was immediately approached by Dobbins, who was wearing only a towel.  Dobbins was extremely agitated and begged Gay not to disclose the obviously embarassing situation.  Together, they walked down the stairwell to the fifth floor and then took an elevator down to the first floor, where Gay allowed Dobbins to put on civilian clothing.  Gay instructed Dobbins to wait in the smoke room while Gay waited for Ms. Reynolds to arrive for her normal shift, which began at midnight.

    Ms. Reynolds arrived at the Federal Building at approximately 11:55 p.m. and, according to Defendant, Gay met her at her vehicle.  Def.'s Mem. at 3.  According to Defendant, Gay got into Ms. Reynolds' truck and rode with her into the parking lot "telling her about the situation at the same time."  Id.  Ms. Reynolds could not recall specifically where she had met Gay that evening but testified that it may have been at the employees' entrance to the Federal Building.  Pl.'s Resp. at 4.  Ms. Reynolds also testified that, when she first encountered Gay upon her arrival to work that night, Gay

approached her and asked if she knew of a way to access the penthouse other than by the freight elevator. Id. at 4. She responded no, and asked him why he was inquiring. Id. According to Reynolds, Gay told her only that Dobbins had gotten his keys locked in the freight elevator at the penthouse level. Id. at 5. Reynolds recommended contacting the direct supervisor of the Federal Building, Lieutenant Braun to determine whether he knew of an alternative way to access the penthouse. Id.

Gay and Reynolds then proceeded to the smoke room where they picked up Dobbins and another security officer on duty that night, Jamie Thomas, and attempted to access the penthouse of the Federal Building, where Dobbins's loaded firearm, uniform, and keys remained unsecured. Dobbins, Gay, and Reynolds eventually gained access to the penthouse and Gay retrieved Dobbins's belongings from the elevator. There is some dispute among the parties regarding who was present when Dobbins's belongings were retrieved. According to Defendant, Gay collected the items in the presence of Dobbins and Reynolds. Def.'s Mem. at 3. Plaintiff, however, contends that, although it is true that they were all attempting to gain access to the penthouse together, Gay was the first person up the ladder and he entered the penthouse area alone to collect Dobbins's firearm, uniform, and keys. Pl.'s Resp. at 5.

After the items were retrieved, Dobbins, Gay, and Reynolds returned to Room 190 in the Federal Building, where they discussed how to handle the situation. Dobbins asked that he either be allowed to contact a locksmith to have the door to the penthouse repaired overnight or to simply let someone find the damaged door without reporting the security

4

breach. However, after Reynolds and Gay stepped out of the room to discuss their options, they decided that they needed to complete a 3155 Report on Damage of Government Property and disclose the details of the incident in the narrative section of the report to their highers-up.

 Reynolds and Gay then returned to Room 190, and Gay told Dobbins that any details about Dobbins being naked and leaving his loaded firearm, uniform, and keys unsecured would be omitted from the report. Instead, Dobbins would merely state that the penthouse door had been damaged when he had kicked it in an attempt to get back in the building after he accidentally left his keys in the elevator and was locked on the roof in the cold. Reynolds contends that, although she was in the room at the time this conversation occurred and could hear Gay and Dobbins speaking, she was not privy to the conversation and did not hear what was discussed. Pl.'s Resp. at 5. She contends that at no point during the night did Gay ever inform her that Dobbins had been nude on the roof. Id. Gay subsequently filed the 3155 Report, omitting the details of Dobbins having left his loaded firearm, uniform, and keys unsecured while he was locked out on the roof of the Federal Building, naked.

 Approximately six weeks after the August 31, 2003 security breach, Arthur Sibley, GSSC Contract Manager, became aware that Gay had told a fellow employee that he (Gay) felt very guilty about submitting a false 3155 Report. Sibley subsequently caused a supplemental 3155 Report to be filed which contained the previously omitted information regarding Dobbins's actions. On October 14, 2003, Sibley provided the supplemental report to FPS and stated that he would conduct an internal investigation into the security

5

breach. He did so, and, on October 16, 2003, he reported his findings to FPS. The day after receiving the internal investigation results from GSSC, FPS commenced a criminal investigation led by Special Agent Mark Fullerton who had been appointed by Special Agent in Charge Charles Murray.

On October 17, 2003, Fullerton began his investigation by examining the roof of the Federal Building where the security breach had occurred and obtaining photographs of the damaged penthouse door. From October 17, 2003 to October 20, 2003, Fullerton conducted fourteen interviews of individuals with knowledge of the events that occurred on August 31, 2003. FPS Area Commander Mark Lambert sat in on the interviews at the request of Fullerton, but Lambert neither conducted the interviews nor had any other role in the criminal investigation. Lambert acted solely as an intermediary between GSSC and FPS.

Reynolds was one of the fourteen individuals Fullerton interviewed. During that interview, Reynolds informed Fullerton that she did not recall specifically where she had first encountered Gay after she arrived at work on the evening of the incident. Pl.'s Resp. at 6. Fullerton later testified by deposition that this response contributed to his suspicions that Reynolds was being untruthful for fear that acknowledging that Gay had met Reynolds at her car would lead to additional questioning. Fullerton Dep. at 103-105.

Fullerton also interviewed Gay as part of his investigation. According to Fullerton's declaration in this case, Gay told Fullerton that he had informed of Reynolds of all of the details of the incident with Dobbins, including the fact that Dobbins had been

6

naked on the roof. Fullerton Decl. ¶ 10. The affidavit signed by Gay after that interview, however, states simply that Gay "told [Reynolds] about the situation." Gay Affidavit.

After dedicating approximately sixty-three hours to the criminal investigation, Fullerton prepared an FPS Report of Investigation. Based on his findings, Fullerton, with Murray's approval, decided to pursue criminal charges against those individuals involved in the security breach. On December 4, 2003, Fullerton submitted a sworn probable cause affidavit to the Marion County Prosecutor's Office for review in which he described the security breach. However, it is not clear from the affidavit exactly what Gay told Reynolds about the security breach when she came on duty the night of August 31, 2003. The probable cause affidavit states only that "[Reynolds] was advised of the situation." Affidavit for Probable Cause. There is no indication whether Gay told Reynolds that Dobbins had been nude when he was locked out on the roof of the Federal Building. Reynolds testified by deposition that Gay never told her this detail. Reynolds Dep. at 146. The affidavit also makes no reference to the suspicions Fullerton later testified to relating to Reynolds' answer regarding where she originally encountered Gay on the evening of the incident.

On December 5, 2003, the Criminal Division of the Marion Superior Court issued summonses for Dobbins, Gay, and Reynolds. GSSC placed Reynolds on an unpaid leave of absence at that time. Dobbins subsequently pled guilty to criminal mischief and Gay pled guilty to false reporting. Reynolds was charged with false reporting, the specific allegation being that she falsely reported certain details of the security breach to FPS

officers.[2]  On March 8, 2004, Fullerton testified at an evidentiary hearing in Reynolds's criminal case.  At that hearing, the state court concluded that there was sufficient evidence to proceed on the false reporting charge against Reynolds, i.e. probable cause, and the case thus proceeded to trial.  Following the trial, on May 6, 2004, Reynolds was acquitted.  Despite the verdict in Reynolds's favor, FPS submitted written notice to GSSC prohibiting Reynolds from working under the security contract.  On June 11, 2004, GSSC terminated Reynolds's employment because no non-contract positions were available.  On February 7, 2007, Reynolds filed her Complaint in this action, asserting a claim for malicious prosecution against the United States, pursuant to the FTCA.  On February 6, 2008, we dismissed the case for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), Fed. R. Civ. P.  On December 9, 2008, the Seventh Circuit vacated that decision and the case was remanded for further proceedings.

## Legal Analysis

**I.   Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

---

[2]According to Fullerton, the exact charge against Reynolds was changed at one point based on the decision of the prosecutor.  The original charge had been that Reynolds had falsely reported her knowledge of Dobbins's nudity.  For reasons that are not entirely clear from the deposition testimony, that charge was later altered to allege that Reynolds had falsely reported where she had originally encountered Gay upon arriving to work on the evening of the incident.

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises,

Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

Thus, the question presently before this Court is whether a genuine issue of material fact exists with regard to each element of Plaintiff's claim of malicious prosecution.

## II.     Discussion

Under Indiana law, in order to establish a claim for malicious prosecution, a plaintiff must prove the following: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted with malice in so doing; (3) the defendant had no probable cause to institute the action; and (4) the prosecution terminated in the plaintiff's favor.  Kopka, Landau & Pinkus v. Hansen, 874 N.E.2d 1065, 1075 (Ind. Ct. App. 2007) (quoting Crosson v. Berry, 829 N.E.2d 184, 189 (Ind. Ct. App. 2004)). For purposes of its motion, Defendant concedes that the first and fourth of these elements have been established.  Thus, only the remaining two elements, malice and lack of probable cause, are potentially relevant for purposes of our decision.  Additionally, as noted above, if there is a lack of genuine issue of material fact with regard to either

element, summary judgment is warranted. See Celotex, 477 U.S. at 323. Because we can find no evidence upon which a reasonable jury could find malicious intent in this case, summary judgment must be entered.

### A. Malice

"[T]he element of malice may be inferred from a total lack of probable cause, from the failure to make a reasonable or suitable inquiry, and from a showing of personal animosity." Kroger Food Stores, Inc. v. Clark, 598 N.E.2d 1084, 1089 (Ind. Ct. App. 1992). Plaintiff has brought forth no evidence of an inadequate investigation or of any personal animosity against her. Moreover, a total lack of probable cause cannot be shown in light of the state court judicial determination of probable cause. In clear contrast, Defendant has established that Fullerton and Reynolds had no personal knowledge of each other prior to the investigation. This fact, along with Defendant's evidence of the thorough investigation preceding the case against Reynolds, goes unanswered. There clearly is no evidence of a personal animosity underlying this case.

Defendant correctly points out that, in lieu of adducing any evidence, Plaintiff simply contends that no evidence is required. Plaintiff has misinterpreted Indiana law on this point. The cases cited by Plaintiff stand for the proposition that only a jury may weigh evidence and find malice. But judgment as a matter of law is appropriate where absolutely no such evidence exists. See, e.g. Golden Years Homestead Inc. v. Buckland, 466 F. Supp. 2d 1059, 1071 (S. D. Ind., 2006) (J. Barker) *aff'd* 557 F.3d 457 (7th Cir. 2009) ("The lack of substantial evidence here makes summary judgment as to motive

unavoidable."); Boyd v. Hodson, 117 Ind. App. 296 (Ind. Ct. App. 1947) (affirming the trial court's directed verdict against a malicious prosecution claim for lack of evidence tending to prove malice and want of probable cause).  This comports with the well-established summary judgment standard.  See Celotex, 477 U.S. at 322 (mandating summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial"); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) ("there must be evidence on which the jury could reasonably find for the non-movant").  Because there is no evidence upon which a reasonable jury could find malice in this case, we find that no genuine issue of material fact exists with regard to that element and that Plaintiff's case fails as a matter of law.

### B.     Probable Cause

In Indiana, "a judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution."  Glass v. Indiana, Inc., 802 N.E.2d 461, 467 (Ind. Ct. App. 2004) (citing Conwell v. Beatty, 667 N.E.2d 768 (Ind. Ct. App. 1996)). In order to rebut such a prima facie case of probable cause, a plaintiff may introduce evidence "that shows the finding of probable cause was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing."  Glass, 802 N.E.2d at 467.  It is undisputed that a judicial determination of probable cause was made in the case at bar.  Thus, Defendant has brought forward prima facie evidence of probable cause and

the burden now shifts to Reynolds to bring forward evidence of the type mentioned above. Plaintiff provides little, if any, such evidence. We concede that it seems strange that Fullerton's Probable Cause Affidavit includes only a vague reference to the very evidence the court relied upon in making its probable cause determination, i.e. Gay's statement to Fullerton that Reynolds knew of Dobbins's nudity. But, without benefit of something more, there is no evidence that the previous judicial determination was incorrect or improperly obtained. Furthermore, even a cursory examination of the evidence fails to indicate that it was unreasonable for Fullerton to have been induced to act as he did in bringing the charges to the attention of the state prosecutor. In any event, we need not decide whether the evidence presented sufficiently rebuts the prima facie evidence of probable cause, given our previous determination regarding malice.

## Conclusion

Having found no genuine issues of material fact to exist as to Plaintiff's malicious prosecution claim, we hereby GRANT Defendant's Motion for Summary Judgment in its entirety, with Final Judgment to be entered accordingly.

IT IS SO ORDERED.

Dated: _____08/20/2010_____  

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Mickey J. Lee
STEWART & IRWIN P.C.
mlee@silegal.com

Margaret A. Schutte
UNITED STATES ATTORNEY'S OFFICE
margaret.schutte@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov